,Carney v. Havens.

THOMAS CARNEY v. A. B. HAVENS, *Administrator, &c.*

1. PAYMENT FOR SERVICES, *When Due.* Where services are performed under a single and entire contract, in the absence of stipulations to the contrary, payment is not due until the services are fully performed and the contract completed.

2. STATUTE OF LIMITATIONS—*Begins to Run, When.* If, pending such a contract, the party employed to render the services, dies, the statute of limitations does not begin to run on the claim for compensation, until by the appointment of an administrator or executor, there is some one authorized to collect and receive the compensation.

*Error from Leavenworth District Court.*

ACTION brought by *Havens*, as administrator of the estate of *Elijah C. Stevens*, deceased, against *Thomas Carney* and *Thomas C. Stevens*, as partners, for work and labor done by the decedent, and for moneys by him deposited with the defendants. Trial at the September Term, 1875, of the district court, and judgment for the plaintiff. *Carney* brings the case to this court. The facts appear in the opinion.

*Thos. P. Fenlon, E. L. Carney, Clough & Wheat,* and *J. D. Shafer,* for plaintiff in error.

*H. W. Ide,* for defendant in error.

The opinion of the court was delivered by

BREWER, J.: This was an action by Havens, as administrator of the estate of Elijah C. Stevens, deceased, against Thomas Carney and Thomas C. Stevens, as partners. The petition contained two causes of action — the first, for work and labor done by the deceased; the second, for moneys deposited by him. Stevens made default, but Carney filed an answer and contested the action, and, judgment having been rendered against him, now brings the case here. By consent, the cause was referred to a referee, to report on all the issues of fact and law. The referee made a report, and it not being satisfactory, the cause was referred for further findings. Another report was made, to which defendant excepted and moved for a new trial, but the court overruled the exceptions and the motion for a new trial, and rendered judgment for the administrator, against both defendants, for $3,694, that being the share of the deceased in the profits on a herd of cattle taken to Fort Union, New Mexico. There is no case-made or bill of exceptions in the record, and the petition in error is predicated solely on the pleadings, the report of the referee, and the journal entries in the case. It must be assumed that the testimony warranted the findings

of fact made by the referee, and for the purposes of this case, those findings must be considered as substantial verities.

So far as the second count is concerned, it is now out of the case, and the substantial question for our determination arises on the plea of the statute of limitations; and this hinges on the further question, whether a cause of action had accrued to the deceased prior to his death, or only matured at and by his death. The deceased died while in the employ of defendants, on September 5, 1865. Administration on his estate was first taken out in 1872, and this action was commenced December 23, 1872. Now if the cause of action had accrued prior to the death of Elijah C. Stevens, then, as the death of the creditor does not suspend the running of the statute after it has commenced to run, the action was barred. (*Green v. Goble*, 7 Kas. 297.) On the other hand, if no cause of action had accrued until the death of Stevens, then, as there was no one who could sue until administration, the statute never commenced running until 1872, and suit was brought immediately thereafter. Now it appears that Elijah C. Stevens had been in the employ of defendants for some years prior to his death, most of the time in charge of a branch of their business at the Sac and Fox agency, but except as hereafter stated, without any special arrangement as to his compensation. The further facts appear in the following findings of the referee:

"8. During the last year of E. C. Stevens's employment, the said T. C. Stevens & Co. projected and carried out a scheme for conveying a large herd of cattle, of a thousand head and over, from the Sac and Fox agency to Fort Union, in New Mexico, there to be sold. This project was carried out under the supervision of E. C. Stevens, who assisted in purchasing the cattle, and who conveyed the herd to its destination, and the profits amounted to from $12,000 to $14,000.

"8½. That the cattle arrived at Fort Union, New Mexico, early in January, 1865. They, together with the mules, wagons and ponies (except one team of four mules and one wagon), were sold by E. C. Stevens and one Guilford Dudley, and the proceeds were immediately forwarded to Carney and

Stevens, at Leavenworth, Kansas, and the same were by them received about that time. Afterward, Dudley and E. C. Stevens took the remaining team and wagon and returned to Leavenworth about the month of April, 1865, and reported on their sales, when Carney and Stevens settled with and paid Dudley, and of the money received by them from Fort Union paid to E. C. Stevens $2,000 for the mules and wagons and ponies belonging to him, which were sold with or at the same time with said cattle.

"9. After the end of the expedition referred to in the 8th finding, the said T. C. Stevens & Co. were organizing a second herd, to be sent through the same route, and E. C. Stevens was preparing and gathering the herd for such expedition, and while so engaged, on the 5th day of September, A. D. 1865, said E. C. Stevens was drowned, in the employ of said T. C. Stevens & Co.

"10. It was understood and agreed between the said T. C. Stevens and Thomas Carney, as the firm of T. C. Stevens & Co., and E. C. Stevens, that E. C. Stevens should have a fourth interest in the profits of these cattle herds, as a compensation for his services, there being no contract that he was to make good any loss.

"11. That the share of E. C. Stevens in the profits of the herd of cattle which were taken through, amounted to about $3,000.

"12. That during the year 1872 the plaintiff took out letters of administration on the estate of E. C. Stevens, which was the first administration of the said estate since the said E. C. Stevens's death.

"13. That the second herd was not taken to Fort Union until long after the death of E. C. Stevens. If ever taken there, the evidence fails to show what became of them. The evidence shows that when the cattle therefor were finally sold, that there was *considerable* loss, but it nowhere shows how much of a loss was sustained, nor whether the loss was the result of causes which arose before or after the death of E. C. Stevens.

"14. That the understanding with which these cattle herds were gathered was, that E. C. Stevens and one Parkinson were to use the money furnished them to buy cattle to take to New Mexico, by Carney & Stevens, who were to own the cattle, and as compensation for the labor in buying and taking said cattle to New Mexico, E. C. Stevens and Parkinson

were each to have one-fourth of the profits that came from the sale of said cattle. After the purchase of the cattle, but before the cattle were started to New Mexico, Carney & Stevens purchased Parkinson's interest in the profits for $2,000, and E. C. Stevens went through with the cattle.

"15. That the organization of these herds of cattle was to comply with a contract to supply certain Indians, made by the United States with some contractors, and which was being filled by Carney & Stevens; and this expedition to New Mexico by E. C. Stevens, and the second expedition, which was being organized when E. C. Stevens was drowned, was on the same contract and a continuance of the same agreement as to profits between E. C. Stevens and Carney & Stevens.

"16. That the amount to be paid by Carney & Stevens to E. C. Stevens for his share in the first expedition did not depend on the result of the second expedition."

From these findings it would seem that sometime during the fall of 1864 an arrangement was made with deceased which contemplated the sending of two droves of cattle under his care to New Mexico, and that while engaged in this work, and prior to its completion, he died. *Prima facie*, payment for work is due when the work is done, and not due till then. Wages for services, when a specific time or amount of service is contracted for, are only due when the services are fully rendered, and it matters not how great may be the variety or amount of the services, provided they are included in a single contract. Where services are rendered under one and the same agreement, the statute of limitations begins to run from the termination of the contract, and not from the time when the services were rendered, though no work is done within the period of the statute. (*Vanhorn v. Scott*, 28 Pa. St. 316.) Against an account for work and labor done under an agreement for payment, not specifying at what time such payment should be made or how long such labor should be performed, the statute of limitations does not commence running until the labor ends. (*Littler v. Smiley*, 9 Ind. 116.) Ordinarily, parties fix by their agreement the time and mode as well as the amount of payment, at least in cases of im-

portance. But when they fail to express either, it is understood that they intend what the law implies. We see nothing to take this case out of the general rule. The only thing that tends to show this an exception, is the manner in which the compensation was to be determined, *i. e.*, by the profits on each drove. If he was to receive a certain share of the profits on the first drove, irrespective of the results of the second, was it not due to him when those profits were ascertained and realized? Doubtless this was a circumstance from which, with very little additional testimony, a jury would be warranted in finding that payment was intended as soon as the profits were realized upon the first drove; but it does not, standing by itself, as matter of law prove that payment was then due. It does not of itself divide the contract, otherwise shown to be an entire one. Many reasons might have induced defendants to desire to retain payment until full completion of the contract. As they were furnishing the funds, they might need the money. They might desire to hold it as a guaranty of good faith, and against negligence or abandonment on the part of deceased. Whatever might have been the motive, unless they so contracted they were not bound to pay until the full completion of the contract. That the parties did not intend earlier payment, is supported by the fact that they did not pay; and also by the fact that Dudley, who was with deceased in care of the first drove, and who came in with him after closing up the sale, was settled with and paid; and by the further fact that defendants paid deceased at the same time the proceeds of some individual property sold with the drove. While of course these matters are not convincing and conclusive, yet they support the conclusion of the referee. Nothing else appears worthy of notice affecting the question, and we cannot say that the referee or court erred in concluding that the contract was an entirety, and payment due only upon the completion of the entire contract. As the contract was not completed at the time of the death of the deceased, he had no cause of action, and the statute did not commence to run before his death.

We see no other matter requiring notice, and the judgment will be affirmed.

All the Justices concurring.